IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MARK GODDARD, M.D., } | |
| } | |
| Plaintiff, } | |
| } | CIVIL ACTION NO. |
| v. } | 04-AR-2305-S |
| } | |
| ROBERT EICHELBERGER, M.D., et } | |
| al., } | |
| } | |
| Defendants. } | |

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion for summary judgment of defendants, Robert Eichelberger, M.D. ("Eichelberger") and Robert Eichelberger, M.D., P.C. (the "P.C."). This case arises out of the termination of plaintiff's employment and defendants' refusal to pay salary and benefits that plaintiff, Mark Goddard, M.D. ("Goddard"), claims he was owed. The complaint contains five counts: breach of contract (count one), promissory fraud (count two), fraudulent suppression (count three), quantum meruit (count four), and enforcement of ERISA benefits (count five).[1] Goddard asserts the breach of contract claim solely against the P.C. All his other claims are against both Eichelberger and the P.C. In accordance with the following, defendants' motion will be granted in part and the case will be remanded to the state court.

---

[1] Defendants removed the action to this court from the Circuit Court of Jefferson County, Alabama, on July 26, 2004. This court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1441, 1331, and 1367.

*Summary Judgment Facts*[2]

The P.C. employed Goddard as a radiologist from September 1, 2000, until December 8, 2003. At all times relevant to this action, Eichelberger was the sole shareholder of the P.C. Prior to the date Goddard commenced his employment with the P.C., he and Eichelberger memorialized certain terms of their employment agreement in a letter dated July 21, 2000. As implied by this letter of understanding, Eichelberger and Goddard contemplated an employment term of three years, after which Goddard would have an opportunity to become a shareholder in the P.C.

On September 1, 2000, Goddard began working for the P.C. The P.C. and Goddard executed a written employment agreement eight months later that was retroactively effective to Goddard's start date. The agreement was for a three year term ending on August 31, 2003. The agreement provided that Goddard would receive a monthly base salary of $25,000 plus a quarterly bonus payable on specified dates over the three year term. The amount of the quarterly bonus increased every year under the agreement such that on the date it expired, August 31, 2003, Goddard's

---

[2] Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P.; *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). In assessing whether the movant has met its burden, the court must view the evidence, and all inferences drawn therefrom, in the light most favorable to the non-movant. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 918 (11th Cir. 1993). In accordance with this standard, the following statement of facts includes both undisputed facts and the facts according to the plaintiff's evidence, where there is a dispute.

2

quarterly bonus was $37,500.  The bonus payments were not discretionary.  The agreement further provided that it was terminable "without cause" by either party upon ninety days written notice.

The written employment agreement expired by its own terms on August 31, 2003.  At that time, Goddard and the P.C. were negotiating the terms of a new employment agreement and a shareholder agreement.  Goddard continued to work for the P.C. after the written agreement expired.  He was paid $25,000 per month, just like he had been under the written agreement.  In fact, there were no noticeable changes in his employment arrangement.  Eichelberger does not recall discussing the terms of Goddard's post-agreement employment.  Goddard, on the other hand, declares that he discussed partnership with Eichelberger before the written agreement expired.  At that time, Eichelberger assured him that the partnership documents were being prepared by his attorney and stated that everything was "working fine." Eichelberger went on to say that it was in the best interests of Goddard and the P.C. "to engage in the negotiation of the [partnership] agreements with 'no disruption' to the then-existing arrangements."  Goddard Decl. ¶ 11.

Sometime after the expiration of the written agreement, Goddard received drafts of shareholder and employment agreements to review.  Goddard was surprised to learn that under the draft

shareholder agreement Eichelberger would retain voting control of the P.C.  Based on his experience, Goddard believed that he would be offered shares with equal voting rights.  Goddard expressed his concern over voting inequality to Eichelberger, who told him that they could negotiate further.  Goddard, acting through his attorney, proposed changes to the agreements and returned the "marked up" copies to Eichelberger's attorney for review on December 3, 2003.

During the negotiation process, Goddard contacted an entity called MedQuest to inquire about employment opportunities outside the P.C.  Goddard also had a conversation with Ruth Snow ("Snow"), another radiologist employed by the P.C., about potential employment opportunities for radiologists outside the P.C.  Snow told Eichelberger about her conversation with Goddard.  Eichelberger called MedQuest and confirmed that Goddard had contacted that company.  Suspecting that Goddard was planning to leave the P.C. and compete against it, Eichelberger decided to fire Goddard.  On December 5, 2003, he delivered written notice of termination to Goddard effective December 8, 2003.  There is no dispute that the termination was "without cause" as that term is defined by the then-expired written agreement.

As an employee, Goddard was eligible to participate in the P.C.'s 401-k profit sharing plan.  The P.C. made annual contributions to Goddard's plan account.  Under the terms of the

4

plan, an individual must be employed on the last day of the year in order to qualify for the P.C.'s contribution to his account. Eichelberger admits that he was aware of cost savings that would inure to the P.C.'s benefit by terminating an employee prior to the end of a plan year.

*Analysis*

Goddard claims that the P.C. breached its implied in fact contract with him in several respects.  First, he alleges that the contract required the P.C. to give him ninety days written notice prior to terminating the agreement without cause.  Because the P.C. gave him only three days notice, Goddard maintains that the P.C. breached the agreement by failing to pay his $25,000 monthly salary for the additional required notice period. Second, Goddard claims that the P.C. was contractually obligated to pay him a $37,500 quarterly bonus for the quarter ending November 30, 2003.  Third, he claims that he is entitled to an additional $37,500 bonus that he would have earned if the P.C. had honored its ninety days notice obligation.  As an alternative to these breach of contract theories, Goddard claims that he is entitled to recover on an unjust enrichment theory. Goddard further alleges that Eichelberger and the P.C. defrauded him regarding the opportunity he would have to become a shareholder of the P.C. and as to the terms of his compensation after the written agreement expired.  Finally, Goddard claims that

5

Eichelberger and the P.C. violated ERISA by terminating him in order to deprive him of a contribution to his profit sharing account.

Taking the claims in reverse order, the court determines that defendants' motion is due to be granted as to the ERISA claim, causing the disappearance of any basis for federal question jurisdiction, the only basis upon which the case was removed. The case will be remanded accordingly.

<u>ERISA Discrimination Claim</u>

Goddard's § 510 ERISA claim has to do with the P.C.'s failure to contribute to his profit sharing account for the year 2003.[3] There is no dispute that the plan documents require a participant to be an employee as of December 31 in order to receive a contribution from the P.C. Neither is the fact that Goddard was not an employee at the end of 2003 disputed. Instead, Goddard claims that Eichelberger's decision to terminate him in early December 2003 was motivated by a desire to deprive him of the right to receive a profit sharing contribution for that plan year. *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1344 (11th Cir. 2000)(plaintiff may establish *prima facie* ERISA

---

[3] Section 510 of ERISA, 29 U.S.C. § 1140, provides in relevant part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary...for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan...

discrimination claim by showing "(1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination"). Defendants respond by denying that Goddard has presented evidence sufficient to support the third element of his *prima facie* case and by offering Eichelberger's belief that Goddard was planning to quit and to compete with the P.C. as a legitimate nondiscriminatory reason for the decision to terminate him.

Goddard's ERISA claim fails as a matter of law because there is no evidence that the proffered legitimate reason was pretextual. It may have been mistaken or unwise, but it made business sense to Eichelberger. Assuming *arguendo* that the relatively close temporal proximity between Goddard's termination and the end of the plan year coupled with Eichelberger's admission that he was aware of the cost associated with keeping an individual employed through the end of a plan year "suggests interference with ERISA rights was a motivating factor" in the termination decision, the ERISA claim still fails. *See Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1223-24 (11th Cir. 1992). Once a defendant identifies a legitimate nondiscriminatory reason, the burden is on Goddard to offer evidence that defendant's articulated reason is a pretext – that it should be disbelieved or that a discriminatory reason more likely than not

motivated the decision.  Goddard has failed to present any evidence of pretext.  His argument that Eichelberger's failure to inquire of MedQuest as to the substance of Goddard's conversations with that entity does not give rise to an inference of pretext.  The undisputed evidence is that another radiologist within the P.C. came to Eichelberger and told him that Goddard had contacted MedQuest.  Eichelberger then confirmed with MedQuest that Goddard had in fact contacted it.  The fact that Eichelberger did not press MedQuest on the details of its communications with Goddard does not tend to prove pretext.  The decision retains the earmarks of legitimacy.  Defendants' motion is due to be granted accordingly as to the ERISA claim.

<u>Remand</u>

Subject matter jurisdiction in this removal case was grounded exclusively on the existence of a federal question, namely the ERISA claim.  28 U.S.C. § 1331.  Jurisdiction over Goddard's state law claims is supplemental under 28 U.S.C. § 1367(a).  Because the court has now concluded that summary judgment is appropriate as to Goddard's ERISA claim, the federal question upon which the court's supplemental jurisdiction depends has evaporated.  Therefore, the court will exercise its discretion under § 1367(c)(3) and decline to exercise supplemental jurisdiction over the purely state law claims that remain, expressly declining to rule on the merits of defendants'

motion for summary judgment as to said claims.  *See Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346 (11th Cir. 1998).

*Conclusion*

By separate order, the motion for summary judgment will be granted in part and the case will be remanded to the state court from which it was removed.

DONE this 18th day of May, 2005.

_____
WILLIAM M. ACKER, JR.

UNITED STATES DISTRICT JUDGE